UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| ROBERT LONNELL SMITH, JR.,<br><br>　　Plaintiff<br><br>v.<br><br>WASHOE COUNTY, et al.,<br><br>　　Defendants | Case No.: 3:21-cv-00123-ART-CSD<br><br>**Report & Recommendation of<br>United States Magistrate Judge**<br><br>Re: ECF No. 82 |

This Report and Recommendation is made to the Honorable Anne R. Traum, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is a motion for summary judgment filed by defendants Balaam, Barrett-Venn, German, Rice, and Washoe County. (ECF Nos. 82, 82-1 to 82-4.) Plaintiff filed a response. (ECF No. 86.) Defendants filed a reply. (ECF No. 87.)[1]

After a thorough review, it is recommended that Defendants' motion be granted.

**I. BACKGROUND**

Plaintiff is currently an inmate in the custody of the Nevada Department of Corrections (NDOC), but the allegations of his pro se complaint under 42 U.S.C. § 1983 took place when Plaintiff was a pretrial detainee at the Washoe County Detention Facility. (Am. Compl., ECF No. 8.)

The court screened Plaintiff's amended complaint and allowed him to proceed with: (1) a First Amendment claim for interference with free speech by censoring legal materials against

---

[1] Defendant Garza has also filed a motion for summary judgment (ECF No. 89); however, that motion will be addressed in a separate report and recommendation.

Johnson and Garza; (2) a First Amendment claim for interference with free speech based on the jail's postcard only mail policy against Washoe County and Washoe County Sheriff Darin Balaam; and (3) a Fourteenth Amendment claim for unconstitutional conditions of confinement as a result of inadequate access to exercise against defendants German, Barrett-Venn, Rice, Sheriff Darin Balaam, and Washoe County. (Screening Order, ECF No. 9.)

Defendant Sheriff Balaam was dismissed as a defendant because he was duplicative of defendant Washoe County. (ECF Nos. 56, 88.) The court denied a previous motion for partial summary judgment brought by defendants German, Barrett-Venn, Rice, Balaam, and Washoe County based on the argument they were entitled to qualified immunity as to the Fourteenth Amendment inadequate access to exercise claim because there was insufficient evidence presented to determine whether this case fell under clearly established precedent or not. (ECF Nos. 57.)

On December 7, 2022, the court held a status conference and continued the dispositive motions deadline until January 13, 2023. (ECF No. 66.) Defendants filed their motion on that date. (ECF No. 82.) The dispositive motions deadline was subsequently continued again for defendant Garza. (ECF No. 84.)

On January 10, 2023, the court gave Plaintiff until January 26, 2023, to file a proof of service for Johnson, and cautioned that a failure to do so, or failure to make a showing of good cause as to why Johnson has not timely been served, would result in Johnson's dismissal without prejudice under Federal Rule of Civil Procedure 4(m). (ECF No. 81.) At a January 17, 2023, status conference, the court granted Plaintiff's oral motion to dismiss defendant Johnson from this case. (ECF No. 84.)

Moving Defendants argue that Plaintiff's conditions of confinement did not violate the Fourteenth Amendment as he had meaningful access to recreational opportunities; there is no clearly established legal precedent that would place the Fourteenth Amendment constitutional question beyond debate; the facts show that Washoe County's policies and procedures did not violate the Fourteenth Amendment; and Washoe County did not violate Plaintiff's First Amendment rights.

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all

reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial."

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

### III. DISCUSSION

**A. Plaintiff's Opposition**

Plaintiff's only argument in response to this motion is that the motion is moot because these Defendants previously filed a motion for summary judgment which was denied, and they did not file an objection to the report and recommendation or a motion for reconsideration of Judge Traum's order. (ECF No. 86.)

These Defendants did file a *partial* motion for summary judgment only as to the Fourteenth Amendment claim, and it was only based on the argument they are entitled to qualified immunity. The motion was denied because the court found Defendants did not present sufficient evidence to demonstrate whether the facts in this claim would come within clearly established precedent or not.

The court extended the dispositive motions deadline after this initial motion for partial summary judgment was denied, in contemplation that additional dispositive motions might be filed. Plaintiff did not object to that order, nor did he raise an argument that Defendants were precluded from filing a subsequent dispositive motion. Therefore, the court rejects Plaintiff's argument that Defendants are now precluded from seeking summary judgment.

///

**B. Fourteenth Amendment Conditions of Confinement**

    **1. Facts**

The following facts have not been disputed by Plaintiff:

Plaintiff was housed at WCDF beginning on June 10, 2020. (ECF No. 8.) From June 10, 2020, until May 31, 2022, his tier time[2] totaled roughly 1,564.57 hours, which is an average of 2.17 hours per day, or in excess of 15 hours per week. (Barrett-Venn Decl., ECF No. 82-1 ¶¶ 7-9; ECF No. 82-1 at 8-43.)

During tier time, inmates can use the housing unit's day room, where they can engage in a variety of recreational activities, including exercise, educational programming, watch television, read books, play board games and cards, bathe, or discussions with the other inmates. They can use the jail's email system to contact family and friends. (Barrett-Venn Decl., ECF No. 82-1 ¶ 5; Van Der Wall Decl., ECF No. 82-2 ¶ 5.) Inmates also have access to the outside recreation yard during tier time except during times of inclement weather or poor air quality (defined as an Air Quality Index (AQI) of 150 or above). The outdoor recreation yard is roughly 2,000 square feet, and is big enough for inmates to walk and/or jog laps and do other exercise. Inmates have discretion on how they choose to spend their tier time. Inmates may also engage in physical exercise in their cells which, on average, are slightly over 80 square feet. (Van Der Wall Decl., ECF No. 82-2 ¶¶ 3, 6-9; ECF No. 82-2 at 8-14.)

An audit of the weather between June 10, 2020, and May 31, 2022, shows that the outdoor recreation yard was available to inmates between 80 and 85 percent of the time. (Van Der Wall Decl., ECF No. 82-2 ¶ 8.)

---

[2] Tier time is time for inmates to be outside of their cells for recreational activities. (Decl. of Barrett-Venn, ECF No. 82-1 ¶ 4.)

**2. Analysis**

The Fourteenth Amendment prohibits "*all* punishment of *pretrial detainees*." *Norbert v. City and County of San Francisco*, 10 F.4th 918, 928 (9th Cir. 2021) (emphasis original) (citing *Vazquez v. County of Kern*, 949 F.3d 1153, 1163-64 (9th Cir. 2020)). For government action to constitute punishment, it must: (1) "cause the detainee to suffer some harm or disability" and (2) "the purpose of the governmental action must be to punish the detainee." *Id*. "This requires showing at least reckless disregard for inmates' health or safety." *Id*. (citing *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)).

It has long been established that "exercise is 'one of the basic human necessities'" protected by the Constitution. *Id*. at 929 (quoting *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997)); *Pierce v. County of Orange*, 526 F.3d 1190, 1211-12 (9th Cir. 2008)).

In *Spain v. Procunier*, 600 F.2d 189 (9th Cir. 1979), the inmate plaintiffs (who were convicted prisoners) were supposed to get exercise in a corridor in front of eight or nine cells for one hour a day, five days a week. However, in reality, the inmates were given less time for exercise. *Spain,* 600 F.2d at 199. The Ninth Circuit said it need not consider whether the deprivation of outdoor exercise is a *per se* violation of the Eighth Amendment, but a combination of various factors made the court conclude that outdoor exercise was necessary in that case: the inmates were in continuous segregation and spent almost 24 hours a day in their cells with "meager out of cell movement" and exercise in a corridor; the inmates had minimal contact with others; they lived in an atmosphere of fear and apprehension; and they had no programs or training or rehabilitation. *Id*.; *see also Toussaint v. Yockey*, 722 F.2d 1490, 1492-93 (9th Cir. 1984). The Ninth Circuit affirmed the district court's decision to order that inmates confined to this space for more than four years be given outdoor exercise for one hour a day, five days a

week, unless "inclement weather, unusual circumstances, or disciplinary needs made that impossible." *Id*.

In *Pierce v. County of Orange*, 526 F.3d 1190 (9th Cir. 2008), the plaintiff inmates were detainees in Orange County's jails. The court confirmed that "the Fourteenth Amendment requires that pre-trial detainees not be denied adequate opportunities for exercise without legitimate governmental objective." *Pierce,* 526 F.3d at 1211-12. The Ninth Circuit stressed that "[d]etermining what constitutes adequate exercise requires consideration of 'the physical characteristics of the cell and jail and the average length of stay of the inmates." *Id*. at 1212. There, the average time for a detainee to be in jail was 110 days, but for detainees facing "three strikes," it was closer to 312 days. *Id*. The detainee plaintiffs were in administrative segregation and protective custody, and they spent 22 hours or more in their cells each day. *Id*.

*Pierce* noted that other courts have held that "detainees who are held for more than a short time and spend the bulk of their time inside their cells are ordinarily entitled to daily exercise, or five to seven hours of exercise per week, outside their cells." *Id*. (citing *Campbell v. Cauthron*, 623 F.2d 503, 507 (8th Cir. 1980); *Housley v. Dodson*, 41 F.3d 597, 599 (10th Cir. 1994); *Hutchings v. Corum*, 501 F.Supp. 1276, 1294 (D. Neb. 1980)).

In *Pierce*, the detainees in administrative segregation and protective custody generally only received 90 minutes *per week* (or 13 minutes a day) in a space equipped for exercise. *Id*. The court declined to set a specific minimum time for weekly exercise for detainees who spend most of their time in their cells, but the court held the conditions in *Pierce* violated the Fourteenth Amendment. *Id*.

In 2018, in *Shorter v. Baca*, 895 F.3d 1176 (9th Cir. 2018), the Ninth Circuit stressed that it had "confirmed, time and time again, that the Constitution requires jail officials to provide

outdoor recreation opportunities, *or otherwise meaningful recreation*, to prison inmates." *Shorter*, 895 F.3d at 1185. As such, "[t]o vindicate a constitutional right to exercise, outdoor exercise can indeed be required, when 'otherwise meaningful recreation is not available.'" *Norbert*, 10 F.4th at 939.

Plaintiff's allegations are that he is not completely deprived of the opportunity to exercise, but he did not have enough time each day to allot toward exercise because he was kept in his cell for 22 hours or more a day, and he sometimes could not go outside due to inclement weather. He also avers that the outdoor recreation grounds were insufficient to engage in meaningful exercise.

Defendants have provided unrefuted evidence that Plaintiff had an average of 2.17 hours a day of tier time, during which he was free to use the housing unit's day room or the outdoor recreation yard for exercise. The outdoor recreation yard was roughly 2,000 square feet, and the photos submitted by Defendants depicting the area indicate it is of sufficient size to allow an inmate to engage in physical activity and exercise. Even if Plaintiff spent an hour or an hour and a half engaging in other activities during his tier time each day, such as making phone calls or sending or reading emails, he would still have between roughly 5 and 8 hours each week to spend exercising either in the outdoor recreation yard or dayroom. Moreover, during the limited amount of time where he was not permitted to go outside due to inclement weather or hazardous air quality, he could still utilize the dayroom to exercise.

Here, unlike with the previous motion for partial summary judgment, Defendants have presented evidence to demonstrate Plaintiff was provided sufficient time for outdoor recreation opportunities, as well as *otherwise meaningful recreation* at the WCDF. Therefore, Defendants' motion should be granted as to the Fourteenth Amendment conditions of confinement claim.

## C. First Amendment Postcard-Only Policy

### 1. Facts

The following facts have not been disputed by Plaintiff:

Plaintiff challenges WCDF's postcard-only policy that was in effect from 2016 through 2022. There are two general classifications of mail at WCDF: privileged and non-privileged mail. Privileged mail is that received from an inmate's attorney of record. Privileged mail is not affected by the postcard-only mail policy. (Scott Iacoboni Decl., ECF No. 82-3 ¶ 3; Kimberly Lintz Decl., ECF No. 82-4 ¶ 4.)

Non-privileged mail can be further distinguished as personal and business mail. Business mail would include things such as bills, tax-related documents, and other agency correspondence. Personal mail would include postcards from family, friends or third parties, as well as approved books or magazines sent directly from publishers. (Scott Iacoboni Decl., ECF No. 82-3 ¶ 3; Kimberly Lintz Decl., ECF No. 82-4 ¶ 4.) Business mail and approved books and magazines sent directly from publishers are not affected by the postcard-only policy. (Barrett-Venn Decl., ECF No. 82-1 ¶ 17.)

At any given time, there are an average of 1,250 inmates incarcerated within WCDF, which is a 1,364-bed facility. The facility receives approximately 300 pieces of mail per day, with an increase in mail during the holidays. Of the 300 pieces of mail received daily, approximately 100 of those are personal mail, 50 are business-related mail, and 150 are legal privileged mail. (Scott Iacoboni Decl., ECF No. 82-3 ¶ 3; Kimberly Lintz Decl., ECF No. 82-4 ¶ 3.)

1   WCDF staff manually process and inspect each piece of non-privileged mail before
2   distributing it to the inmates. This is to determine whether it contains contraband or prohibited
3   material. A substantial amount of time is devoted to inspection of mail by jail staff. (*Id.* ¶¶ 4-5.)

4   The inmate population at WCDF has steadily increased for the past 10 years. (*Id.* ¶ 7.)
5   There have likewise been increased incidents of attempted smuggling of contraband into WCDF.
6   (Van Der Wall Decl., ECF No. 82-2 ¶ 12; Scott Iacoboni Decl., ECF No. 82-3 ¶ 8.)

7   WCDF adopted the postcard-only policy in 2010, which was updated in 2016, and in
8   effect until April 25, 2022. According to Defendants, the primary objective of the policy was to
9   prevent smuggling of contraband into the jail in order to promote safety and security of the
10  inmates and staff. The secondary objective was to promote efficiency in mail delivery. (Barrett-
11  Venn Decl., ECF No. 82-1 ¶ 11; Van Der Wall Decl., ECF No. 82-2 ¶ 12; Scott Iacoboni Decl.,
12  ECF No. 82-3 ¶¶ 15, 18; Kimberly Lintz Decl., ECF No. 82-4 ¶¶ 7-8.)

13  Smuggling of contraband into the jail is one of the most serious issues facing jail staff.
14  One of the major concerns of contraband is the introduction of illegal drugs/controlled
15  substances into the jail, including fentanyl, methamphetamine, suboxone, heroin, phencyclidine
16  (PCP), lysergic acid diethylamide (LSD), marijuana, cocaine, and a variety of powdered or
17  ground up pills. (Barrett-Venn Decl., ECF No. 82-1 ¶ 11; Scott Iacoboni Decl., ECF No. 82-3 ¶
18  8.)

19  Drugs have entered the jail by being "painted" onto paper sheets or paper sheets being
20  soaked in liquified drugs. (Barrett-Venn Decl., ECF No. 82-1 ¶ 11; Van Der Wall Decl., ECF
21  No. 82-2 ¶ 12; ECF No. 82-2 at 18, 21; Scott Iacoboni Decl., ECF No. 82-3 ¶ 9.) Squares of
22  soaked paper with drugs can be hidden beneath letter or stamp adhesives or sent as an entire
23  sheet. These items have been received by WCDF inmates and torn into small squares which can

contain potentially fatal doses. Once in the jail, the squares are also sold to other inmates. These issues pose serious security risks for staff and inmates. The introduction of drugs into the facility in this manner poses the potential for accidental overdose, a risk which has increased with the prevalence of fentanyl, which is a powerful synthetic opioid analgesic similar to, but 50 to 100 times, more potent than morphine. (Barrett-Venn Decl., ECF No. 82-1 ¶¶ 11-13; Scott Iacoboni Decl., ECF No. 82-3 ¶¶ 9, 11; ECF No. 82-3 at 13-23.)

     WCDF staff detail instances where a female inmate received fentanyl via non-privileged mail and soaked the piece of mail in water. The inmate and her cellmate then ingested the liquid, and both overdosed. One female required 13 separate administrations of Narcan, a prescription anti-opioid medication designed to rapidly reverse the effects of opioid overdose. (Scott Iacoboni Decl., ECF No. 82-3 ¶ 11.) In addition, some inmates continue to test positive for fentanyl for days and weeks after entering WCDF, leading jail staff to believe the inmates must be receiving the substance through the mail. (*Id.* ¶ 12.)

     WCDF has experienced overdoses in the facility related to illegally smuggled drugs that have been traced to inmates' family members and the subsequent sale of the drugs within WCDF. In addition, when drugs are sold within the prison, it has resulted in inmates purchasing the drugs being unable to pay their debts which has led to threats and violence between inmates. (Barrett-Venn Decl., ECF No. 82-1 ¶¶ 13-14; Scott Iacoboni Decl., ECF No. 82-3 ¶¶ 10-11.)

     Under the postcard-only policy, inmates may receive an unlimited number of pieces of mail; however, non-privileged personal mail was restricted to postcards measuring 4.25 by 6 inches. It is more difficult to "paint" illegal substances on the postcard or soak the postcard in liquified drugs than paper sheets. It is also easier for staff to screen a postcard as opposed to

sheets of paper and envelopes. (Barrett-Venn Decl., ECF No. 82-1 ¶ 16; Van Der Wall Decl., ECF No. 82-2 ¶ 14; Scott Iacoboni Decl., ECF No. 82-3 ¶¶ 16-17.)

Inmates also have other types of communication available to them: they can place outgoing domestic and international telephone calls to approved persons; approved inmates can receive incoming voicemail messages; inmates can send and receive emails through the JailATM platform; and approved inmates are allowed daily remote video visitation through the iWebVisit.com platform. (Barrett-Venn Decl., ECF No. 82-1 ¶¶ 15, 19.)

The only viable alternative at the time to the postcard only policy was having WCDF staff examine hundreds of pieces of incoming mail by steaming open letters, which would have burdened staff and put them at risk for accidental exposure to these substances. The more individual sheets included in letters, the greater the risk was of contraband coming into the facility. (Barrett-Venn Decl., ECF No. 82-1 ¶ 16; Scott Iacoboni Decl., ECF No. 82-3 ¶ 22.) The postcard-only policy allowed the jail to devote more of its staff to security assignments instead of non-privileged mail screening. In addition, overdoses caused by smuggling contraband necessitate facility-wide lockdowns and investigations, taking staff and medical staff away from their normal daily duties. (Scott Iacoboni Decl., ECF No. 82-3 ¶ 21.)

With the progression of technology, WCDF has recently modified its mail policy so that incoming personal mail is sent to a facility where it is scanned in totality and posted to the inmate's personal account on computerized tablets which the inmate can review using their login and password. (Barrett-Venn Decl., ECF No. 82-1 ¶ 18; ECF No. 82-3 at 25-28; Kimberly Lintz Decl., ECF No. 82-4 ¶ 9; ECF No. 82-4 at 17, 19-20.)

///

///

### 2. Analysis

The only defendant in this claim is Washoe County. A municipality can be liable for the infringement of constitutional rights in certain circumstances. *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 690-95 (1978). "In particular, municipalities may be liable under § 1983 for constitutional injuries pursuant to (1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Horton v. City of Santa Maria*, 915 F.3d 592, 602-03 (9th Cir. 2019).

To impose liability, a section 1983 plaintiff must prove: "(1) [the plaintiff] had a constitutional right of which he was deprived; (2) the municipality had a policy; (3) the policy amounts to deliberate indifference to [the plaintiff's] constitutional right; and (4) the policy is the moving force behind the constitutional violation." *Gordon v. County of Orange*, 6 F.4th 961, 973 (9th Cir. 2021) (internal quotation marks and citation omitted).

During the relevant time period, WCDF had a postcard-only policy for non-privileged personal inmate mail. The question is whether the policy violated a constitutional right, and the policy amounts to deliberate indifference to that right.

Inmates have "a First Amendment right to send and receive mail." *Witherow v. Paff*, 52 F.3d 264, 265 (9th Cir. 1995) (per curiam); *see also Nordstrom v. Ryan*, 856 F.3d 1265, 1271 (9th Cir. 2017). Prison officials may restrict that right only so long as the regulation imposed is "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).

In *Turner v. Safley*, the Supreme Court set forth four factors are court looks at in determining the reasonableness of the regulation: (1) whether there is a valid, rational connection between the regulation and the legitimate government objective behind it; (2) whether alternative means of exercising the right remain available; (3) the impact of an accommodation on prison

staff, prison resources, and other inmates; and (4) whether there are ready alternatives that could further the government's objective, and which would suggest that the regulation was an exaggerated response. *Id*. at 90-91.

Defendants identify the primary objective of the postcard only policy was to prevent smuggling of contraband into the jail in order to promote safety and security of the inmates and staff. The secondary objective was to promote efficiency in mail delivery.

The first *Turner* factor looks at whether there is a valid, rational connection between the regulation and the legitimate government objective behind it. Smuggling of contraband into the prison is an obvious safety and security risk facing jails and prisons. This includes the smuggling of illegal drugs/controlled substances into the facility through the mail. WCDF has experienced drugs/controlled substances entering the jail through the mail. Inmates would then ingest these substances and there were instances of inmates overdosing, requiring the administration of Narcan, and even death. In addition, inmates have engaged in the sale of these substances once in the prison which would create violence and tension among inmates. The postcard-only policy sought to reduce the amount of these substances smuggled in through the mail. It was harder to smuggle the substances in on a postcard, and the amount of substances that could potentially be smuggled in was reduced by virtue of the size and scope of the postcard. In addition, it was easier for correctional staff to inspect a postcard as compared to larger piece(s) of paper.

In sum, Plaintiff has not disputed, and the court finds, there is a valid, rational connection between the legitimate government objective of reducing the smuggling of contraband, including drugs/controlled substances, into the jail, and the postcard-only policy. Therefore, the first *Turner* factor weighs in Defendants' favor.

The second *Turner* factor is whether alternative means of exercising the right remain available. Inmates were not limited in how many postcards they could send and receive. Photographs could be turned into postcards. They were also permitted to make phone calls, use an email platform to send and receive emails, receiving incoming voicemails (if approved), as well as utilize a video visitation platform (if approved). Moreover, the postcard only policy did not apply to legal, privileged mail or business mail, and did not prevent them from receiving books and magazines directly from publishers. Therefore, alternative means of exercising First Amendment rights existed, and this factor weighs in Defendants' favor.

The third *Turner* factor addresses the impact of an accommodation on prison staff, prison resources, and other inmates. Defendants provide evidence regarding the substantial impact that inspecting prison mail and the introduction of drugs/controlled substances has on prison staff. Significant staff time is required to review and inspect prison mail. Resources are diverted when inmates overdose on these substances. This diverts staff from other important duties within the jail. There are also risks posed to staff in reviewing mail that may contain contraband, including drugs/controlled substances that are "painted" onto the mail. Allowing these substances to infiltrate the jail has adverse effects on the inmate population and has resulted in overdoses and even death. While the size of communications are limited to a postcard, the inmates are not limited in the amount of postcards they may send and receive.

The court finds the third *Turner* factor also weighs in favor of Defendants.

The final *Turner* factor is whether there are ready alternatives that could further the government's objective, and which would suggest that the regulation was an exaggerated response. Plaintiff points to no ready alternatives that would further the government's objective and suggest the response was exaggerated. Defendants acknowledge that they have recently

switched to a process where all incoming personal non-privileged mail is scanned and then available for the inmate to view digitally. They assert, however, that the switch was made with advances in technology and that they did not previously have a platform available to provide this service. In the absence of evidence of a ready alternative, the court finds that the fourth *Turner* factor also weighs in Defendants' favor.

In conclusion, the court finds that all four *Turner* factors weigh in Defendants' favor. The evidence before the court demonstrates that the postcard-only policy was reasonably related to the legitimate penological interest of safety and security by reducing the amount of contraband, including drugs/controlled substances, entering the jail. As such, summary judgment should be granted in Defendants' favor.

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **GRANTING** Defendants' motion for summary judgment (ECF No. 82).

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

///
///
///
///

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: June 15, 2023

_____
Craig S. Denney
United States Magistrate Judge